We'll hear Schwebel v. Crandall. Good morning, may it please the Court. Assistant United States Attorney Brandon Waterman on behalf of the government. In this case, the district court misapplied the Child Status Protection Act to determine that the plaintiff was a child for purposes of adjusting her status as a derivative beneficiary, following or accompanying to join her mother on an approved employment visa petition filed in 2012. Is she in remains in the United States for now? Is she here? Yes, she's currently here in pursuant to the district court's decision. She has been accorded LPR status. Supposing you win. We one line order says you win. What happens next? If this court were to reverse the district court's decision. On the basic ground of having the time ran because it's not measured from the first time, but the first application is measured from the second. On that basis, what happens? Yes, Your Honor. In that respect, then the plaintiff would not have been eligible for the benefits. And therefore, what happens? Yes. Well, then the agency could place her either in rescission proceedings to revoke the grant of lawful permanent resident status, or she could be placed in removal proceedings also to take away that status. The Petitioner, though, is not left without remedy. The plaintiff, I'm sorry. The plaintiff has the ability to still seek adjustment of status here in the United States pursuant to her parents based on an I-130 petition as a family-based petition. Her parents are both lawful permanent residents and could petition on behalf of the plaintiff, and the plaintiff would be in the classification of unmarried son or daughter. So the plaintiff would still have a remedy to seek to immigrate to the United States and remain in the United States. There's some question I gather as to whether there would be a some kind of an estoppel, equitable, what's troubling here, and I guess it's obvious, but what's troubling here is there's a lot of this comes from, frankly, what appears to me to be bureaucratic bungling. And that's very troublesome. And I really don't mean to make light of it. It's hard for me to read this and think about how difficult it was for you to get up in an elevator today. It's the same kind of, my God, who's paying the price for all this? And in this case, I'm afraid it's Ms. Schwebel. I certainly understand Your Honor's concerns. If I may just take a step back and explain in 2007 what happened here. Initially, the I-140 petition was filed, I believe it was in January of 2007. The priority date was established based on the approved Department of Labor certificate, which would have set a priority date. I believe it was in September of 2006. Based on that date, the Department of State issued a visa bulletin, which set visa availability dates starting July 1st of 2007, which ultimately concluded due to an oversubscription of numbers in August 17 of 2007. So there's a very limited period of time in which visas could have been available. One thing I think the district court overlooked, and perhaps also was overlooked in the briefing, was that the visa petition that was filed by QuickBuy was not approved until 2008, February 2008. So it was over a year after it was filed that a visa petition was actually approved. So visas technically were not even available, even in that limited visa window, visa availability window, because an I-140 petition had not yet been approved. The district court pointed out, I think, that contrary to the CFRs, that the agency did not record the receipt date of the petition, that even though it was received early, it should have been recorded in this computer system, there would be a record of it, a notice of rejection would be generated, and that none of that was done here. So why couldn't that be the basis for an equitable estoppel claim, that the agency failed to follow its own procedures for these particular premature applications? With respect to that, Your Honor, the agency had submitted a declaration in the district court outlining its policy and practice for 2007. I don't believe that regulation was in effect during the period of time here, and the agency had a practice of manually rejecting, without issuing receipt notices or rejection notices, for prematurely filed petitions. Why would they do that? They didn't do that for any other types of rejection. Why would they put this in a special category? If it's premature, we're not going to keep any record of it. Everything else we'll keep a record of, but not the premature ones. Again, back in 2007, that was the agency's policy or practice. They had issued, they would reject the prematurely filed applications. Why shouldn't that be an equitable estoppel claim, that they failed to keep a record of an application that was filed? Why can't that be the basis for an equitable estoppel claim? Well, equitable estoppel requires a high standard to meet here. It would have to have some affirmative misconduct by the government. Nothing here rises to the level of affirmative misconduct. At most, you have negligence, and that is not sufficient to apply an equitable remedy here. Further, based on the agency's policy of negligence, it was the policy. You're telling me it was the policy of them not to keep these records. So it wasn't negligence. This was the policy of the agency. We're going to get rid of these records. We're not going to keep them, right? I understand Your Honor's point, but the That's not negligence. That's a policy, right? Under the policy or practice of the agency, they would have returned the prematurely filed applications. Given the agency, the benefit of the presumption of regularity, the agency would have returned that. In any event, the agency had issued a notice, I believe it was by August 3rd, that it noted that the agency had gone through all of the applications that had been submitted and would have issued receipt notices by that point. So the plaintiff would have been on notice by August 3rd that something went wrong with respect to the filing of the prematurely submitted I-140 application. Well, there were other submissions that were accepted, which arguably led the plaintiff to think that her application was in and was being considered, right? Yes, Your Honor. There was a, I believe it was a medical part of the, I mean, the decision not to return these things is arguably affirmative misconduct. I mean, if it why would you not tell people that there was a problem with the application? I understand Your Honor's point, but again, we respectfully disagree that the agency did not return this. Based on its policy and practice, the agency would have returned it. The agency simply does not have a record to show and prove that it returned it. But based on the policy ---- Back to Judge Sack's question, I mean, I was wondering why this case isn't, this appeal isn't moot because the petition's now been granted. So you're saying that if we were to reverse, the government would go back and try to rescind the granting of the petition? Yes, Your Honor. Given the equities in the case? I believe that's correct, Your Honor, yes. And what's the reasoning for that? I mean, why would the government go back and try to undo this? Because the plaintiff was not ---- I mean, even in light of all the circumstances, whether it's affirmative misconduct or not, or whether it's simply negligence, why would the government try to undo this granting of the petition? Well, Your Honor, the government's decision whether to place the plaintiff either in removal or rescission proceedings would be, excuse me, a matter of discretion by the agency. But I believe the fact of the matter is the plaintiff was not lawfully eligible or entitled to derive or to lawful permanent resident status as a derivative to her mother on an I-140 petition. And so the agency would seek to reverse that grant. Those visas are in limited numbers, and the plaintiff was not entitled to that visa. I see my time is up. All right. We'll hear from the other side. Thank you, Your Honor. Good morning, Your Honors. Jeffrey Feinblum for the Plaintiff Appellee, Ronit Schwebel. The district court in this case got it right when it held that the government's position finds absolutely no support in the text or structure of the CSPA. The court also got it right when it found the problem underlying this, I'm sorry, as to whether the notion would be, and you will correct me if I'm wrong, the notion would be that by filing that first application, kind of the time starts and doesn't stop. And so that you can just file it, and that's the beginning. That's the date on which that's operative here. And it goes on, and it could go on so long as both mother and daughter are alive. It could go on until the daughter is in her 40s. That's your position? Theoretically, Your Honor, as a practical matter. No, no. I'm talking about what should we do with the decision of the district court. As a practical matter, I know what I would do, and you wouldn't be unhappy with that. But the question is, what should we do with the district court's opinion which would permit that to happen, it seems to me. There's nothing wrong with the district court's opinion in that regard, Your Honor. Here, the government's – one of the government's arguments is that any petition could constitute a basis for – to trigger the CSBA. But that is plainly incorrect. That's not what the district court found, and that's not what the plaintiff is arguing. What would be required, if not any specific? What would be required is what the statute says is required, and there are essentially four elements, and each of those elements are satisfied here. First and foremost, there has to be a qualifying petition, quote, filed under Section 204 of the Act in accordance with the CSBA. There's no dispute, and the government does not contend, that the initial visa petition was not a qualifying petition. Kennedy. I'm interested in what they are in terms of what the holding of the court or the conclusion of the district court means for other cases. And that's why I say, go ahead, tell me what the point is. The conclusion of the district court is extremely narrow, and it's based on the particular circumstances that arose in this case, which are somewhat unique. I've been practicing exclusively in the area of immigration law for 24 years. I've never – I've seen a lot. I've never quite seen a record like this. Do you agree with the district court's reasoning here in your position, any rejected petition, then, that satisfied the timing requirements, would then in perpetuity be? Thank you, Your Honor. No, not at all. Why not? The government did make that claim in their brief. It's not a rejected petition. The petition was approved. I know it wasn't a rejected petition, but wouldn't – the same logic would apply to a rejected petition, right? How would you distinguish a rejected petition? It would not, because only an approved visa petition can trigger, can, as a threshold matter, result in an immigrant visa becoming available, which is the key triggering act under the CSPA, and then the individual, the child, the beneficiary of the CSPA has to come forward, has to seek to acquire status within one year of that date. All of that happened in this case. There's no reasonable dispute that that happened in this case. The government conceded before the district court that that happened in this case. What about the language in the statute that refers to the applicable petition? Why couldn't that be construed to be the petition on which the status was granted and not some prior petition? Thank you, Your Honor. The – it is very clear, based on the plain language and the structure of the CSPA, that that language merely operates to reduce the required age calculation, which starts the date that an immigrant visa became available, and it is only that language is cabined in subsection 1B of the statute. It doesn't require, by any means, there's no language in the statute that would indicate that that serves as the basis for a signal to the agency for when the required age calculation must begin. Moreover, there's absolutely no support, not only in the text and structure of the CSPA, but the government cites no authority for that position. The district court said it quite eloquently when it noted that 1153d, which is a very simple statute that says that children derived the status of their parents are entitled to the same status of their parents, there's nothing in that statute that would compel, much less suggest, that that governs the earliest possible moment where a derivative beneficiary could derive resident status. I'm just going to go back to Judge Sack's question. If she waited until she was 40 in this case, under your reading of the statute, it would still be okay because she satisfied the requirements under the prior petition. Verrilli, I think that would have been a problem with her estoppel argument in that regard, but the Court only gets to estoppel. Alito, you wouldn't have to go to estoppel, right? Verrilli, yes. Alito, you wouldn't have to go to estoppel, then. Verrilli, yes. The Court only gets to estoppel if the Court finds that the government's reading of the statute is reasonable. Alito, under your reading, under district court's reading, that petition at age 40 would be timely, right? Well, the app — I want to make a very careful distinction between the petition and the application. So the petition was the original visa petition that was filed and approved by the agency, okay? That results in the beneficiary's ability to file an application for permanent residency. Our position is simply that the — Ronit is entitled to a decision on her application. Theoretically, if she didn't file that application until she was 40 years old, yes, the statute was triggered in this case, and that is — you know, it was the government's misconduct in this case and mishandling of application one that resulted in this situation. The statute was triggered. This is unambiguous, is that — It's completely unambiguous, yes. It's very plainly stated in the statute. Yes, Your Honor. Let me ask you about the equitable estoppel argument for a moment. I made reference to this regulation about recording the receipt dates, and the government said that that wasn't in effect. HCFR 103.2A7 wasn't in effect at the relevant time. I — is that — is that true? That is not true, Your Honor. 103.2A7 is a regulation that's been in effect forever. It obligates the government to accept or reject a filing, period. What the government was claiming is not in effect at that time was a regulation that, as an aside, is ultra vires, it has now been brought into compliance with the statute, but at the time, because the mother's employer went out of business, that petition, as a matter of regulatory interpretation, was automatically revoked. That is the reason why a second petition was required in this case. However, to suggest that the plaintiff did not — the plaintiff's mother did not benefit from that earlier filing is a fallacy. She would not have been able to adjust status but for the filing and approval of that initial visa petition. And that's a very important point. The priority date is transferred to the employer. Correct, Your Honor. That's correct. And the argument is the child should get the benefit of that same treatment? Absolutely. We are not arguing that she would not — that she's entitled to a benefit that the parent didn't get. And that's a very critical point. It undermines the government's entire 1153D argument. You were going to give us the four elements, and you got to number one. Yes, Your Honor. So quickly do two, three, and four. Very quickly. It's a qualifying petition filed under Section 204. There's no debate that that was, in fact, a qualifying petition. Let's keep the numbers going. That's number one. Yes, Your Honor. The petition has to be approved. The government had argued, bizarrely in their brief at some point, that a rejected petition could support a triggering of the CSPA. That's wrong because, as I argued earlier, a rejected petition could not form the basis for an immigrant visa becoming available, which is the third element that the statute requires. And then the fourth element is this sought-to-acquire mandate. There's no dispute that at that time that Ronit satisfied the sought-to-acquire mandate. And that is — that finding is compelled by the Board's decision in O. Vasquez, which is binding on the government, and the district court noted that in their decision. Thank you. Yes. We'll hear the rebuttal. Thank you. There are really two parts to the CSPA equation. Excuse me. The first is the CSPA age calculation, which we take from the age that the — that the alien was and the date the visa numbers became available, minus by the time that the petition was filing — was filed. The second requirement, though, to get the protection of the CSPA requires that the plaintiff seek to acquire the status within one year. You know, the — looking at the big picture, the point of the statute is to keep the child tethered to the parent so that they're not separated. And here, the mother gets the benefit of the priority date. The old priority date is transferred to the new employer. Why shouldn't the child here get that benefit? That would seem to undermine the purpose of the statute. Yes. If I may, Your Honor, the plaintiff here was over 21 years old at the time the 2012 petition was filed. That is the petition in which the mother had adjusted status through. And as a derivative beneficiary, the derivative is only entitled to the same status that the mother or the principal acquires. The mother did not obtain status through the 2007 petition. Therefore, the derivative cannot either. The derivative — Sotomayor, she got some benefit from the original petition. That carries over. I understand why suddenly the child gets cut off. I understand that, Your Honor. But even if the plaintiff here were entitled to maintain the same priority date, that priority date, the visas became available in September of 2012. At that point, the plaintiff was already over the age of 21 and would not be entitled to the benefits under the CSPA. That is true even if we use the 2007 petition. Because at the time that the visa number actually became available to the plaintiff's mother, that would have been in September of 2012, because, again, looking at the record, you needed both the approved petition, which was not approved until 2008, and visa numbers to be available. The visa window had closed. It was only open from July 1, 2007, until August 17 of 2007. The petition was not approved, so visa numbers were not available. The first time that visa numbers ever became available, even under the 2007 petition, had it not been automatically revoked in 2010, would have been September 2012. And at that time, the plaintiff still would have been over the age of 21 and not entitled to the protections of the CSPA. I see my time is up, Your Honor. We respectfully ask the Court to reverse the disreport. Thank you. We'll reserve decision.